UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

DAYTON SUPERIOR CORPORATION,

                                Plaintiff,          **<u>MEMORANDUM & ORDER</u>**

    -against-                     07 CV 5215  (DRH) (WDW)

MARJAM SUPPLY CO., INC.,

                              Defendant,

    -against-

BARKER STEEL, LLC,

                     Counterclaim Defendant.
-------------------------------------------------------------X

**APPEARANCES:**

**THOMPSON HINE LLP**
Attorneys for Plaintiff
3900 Key Center
127 Public Square
Cleveland, OH 44114
By:    Thomas J. Collin, Esq.
        Jennifer S. Roach, Esq.

335 Madison Avenue
12th Floor
New York, NY 10017
By:    Jeanette Rodriguez

**LEBENSFELD BORKER SUSSMAN & SHARON, LLP**
Attorneys for Defendant
140 Broad Street
Red Bank, NJ 077021
By:    Lawrence Joseph Sharon, Esq.
        Alan M. Lebensfeld, Esq.

**HURLEY, Senior District Judge:**

Plaintiff Dayton Superior Corporation ("Dayton") commenced this diversity action seeking damages based upon an alleged failure by defendant Marjam Supply Co., Inc. ("Marjam") to pay certain outstanding invoices. Dayton asserts claims for breach of contact and unjust enrichment. Dayton has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56 and to strike certain portions of the papers submitted by Marjam in opposition to Dayton's requested relief. For the reasons that follow, Dayton's motion for summary judgment is DENIED and its motion to strike is deemed moot except to the limited extent noted below.

## BACKGROUND

The material facts are drawn from the pleadings, the parties' Local Civil Rule 56.1 Statements, and the affidavits, documents, and deposition transcripts submitted by the parties.

### The Parties

Dayton is a manufacturer and distributor of products used in concrete and masonry construction. Its products are sold throughout the United States. (Pl.'s 56.1 ¶ 1.) Marjam is a distributor and re-seller of construction and building material products, including those produced by Dayton. (*Id.* ¶ 4.) Marjam was a customer of Dayton between 2003 and 2007 and was, according to Dayton, approved to make purchases on credit. (*Id.* ¶ 5; Def.'s 56.1 ¶ 5.)

### Dayton's Allegations Regarding Its Business Practices

Dayton asserts that after its customers submit purchase orders "it is [Dayton's] practice to [ ] then send the customer an order acknowledgment, ship the product to the customer and send an invoice to the customer." (Pl.'s 56.1 ¶ 2.) According to Dayton, both the order acknowledgment and the invoice identify the products ordered by the customer and the amount to

be paid by the customer.  (*Id.*)  Subsequently, Dayton sends its customers a Statement of Account on a monthly basis that shows, among other things, amounts that Dayton has invoiced to the customer but which the customer has not paid.  (*Id.* ¶ 3.)  The Statement of Account also shows finance charges that have accrued on unpaid invoices.  (*Id.*)

### Dayton's Sales to Marjam During 2006 and 2007

The parties agree that between January 9, 2006 and April 26, 2007, Marjam routinely submitted purchase orders to Dayton.  (Pl.'s 56.1 ¶ 7; Def.'s 56.1 ¶¶ 2, 7.)  Dayton contends that upon receipt of each such purchase order, it sent Marjam an order acknowledgment, shipped the products to Marjam as ordered, and invoiced Marjam for the amount owed for the order.  (Pl.'s 56.1 ¶ 7.)  Dayton asserts that it also sent Marjam Statements of Account on a monthly basis during this period showing amounts due and owing.  (*Id.* ¶ 8.)  According to Dayton, Marjam accepted delivery of the subject goods and at no time attempted to revoke acceptance or return any of the goods shipped by Dayton.  (*Id.* ¶ 7.)  Dayton contends that despite receiving invoices and monthly Statements of Account, Marjam has not paid in full for certain of these goods.  (*Id.* ¶ 8.)

### Sales of Levelayer

Six of the invoices for which Dayton claims it has not received payment relate to six purchase orders Marjam submitted on January 31, 2007.  (*Id.* ¶ 9.)  Each purchase order was for a truckload of a product called "Levelayer."[1]  The parties agree that Marjam indicated on each purchase order that the unit price for the Levelayer was $0 and that "Marjam did so for the

---

[1]      Levelayer is defined in the pleadings as a "premium, self-leveling floor underlayment" used "to produce a smooth, cement sub-floor for subsequent applications [of floor coverings] by the end-user."  (Second Am. Answer & Countercls. ¶ 31.)

express purpose of compensating for price discrimination that it believed had occurred." (*Id.*; *see also* Def.'s Counterstatement ¶ 16.)[2]

### Alleged Conversations Between Marjam and Dayton Employees Prior to Marjam's Submission of January 31, 2007 Purchase Orders

The parties' accounts diverge sharply with respect to almost every aspect of Marjam's six January 31, 2007 purchase orders. Marjam asserts that, prior to submitting the purchase orders, James Metcalf, a Product Manager for Marjam, spoke with Joseph Rizzo, a regional sales manager employed by Dayton. Marjam alleges that Metcalf "specifically advised [Rizzo] of Marjam's intention to submit a bulk order at a special price that would at least partially compensate Marjam for Dayton's unlawful price discrimination." (Def.'s 56.1 ¶ 11.) Marjam asserts that Metcalf told Rizzo that he (Rizzo) should confer with Dayton's customer service department upon Dayton's receipt of the purchase orders, and that Rizzo responded by stating his intention to speak with customer service. (Def.'s Counterstatement ¶ 17.) During his deposition, however, Rizzo denied ever speaking to Metcalf (or anyone else at Marjam) prior to the placement of Marjam's January 31, 2007 purchase orders and testified that he was not aware of Marjam's intention to place these orders at a $0 unit price to partially compensate Marjam for Dayton's alleged price discrimination. (Pl.'s Resp. To Def.'s Counterstatement ¶ 17 (citing Rizzo Dep. at 64);[3] *see also* Rizzo Dep. at 21-22, 25-26, 36-37, 60-61.)

---

[2]     Marjam's claims against Dayton for price discrimination in violation of the Robinson-Patman Act are explained in detail in this Court's separate Memorandum and Order bearing today's date resolving Dayton's motion to dismiss Marjam's counterclaims. Familiarity with those facts is assumed for purposes of this motion.

[3]     The transcript of the October 6, 2008 deposition of Joseph Rizzo ("Rizzo Dep.") is attached to the March 29, 2010 Declaration of Lawrence J. Sharon ("Sharon Decl.") as Exhibit B.

### *Order Acknowledgments*

Dayton contends that upon receipt of the January 31, 2007 purchase orders containing the $0 unit price, Dayton generated six order acknowledgments with "the correct purchase price, $13.78 per unit." (Pl.'s 56.1 ¶ 10.)  Vanessa Centeno, a customer service representative for Dayton, who reviewed and handled Marjam's January 31, 2007 purchase orders, testified that when she received the purchase orders, she changed[4] the $0 unit price to $13.78 per unit. (Centeno Dep. at 24-26.)[5]  Centeno made this change because she assumed the $0 unit price indicated by Marjam on the purchase orders was "incorrect" – Centeno testified that she "would have been notified had I [been] authorized [to process] truckload orders of this material at zero dollar." (*Id.* at 25.)  Centeno also testified that she spoke with Rizzo about the $0 unit price on the purchase order and Rizzo told Centeno "he thought it was an error, that was the extent of the discussion." (*Id.*)  Centeno selected $13.78 as the revised unit price by consulting a price list, which contained the prices charged to Marjam as determined by Rizzo, as Marjam's salesman. (*Id.* at 26.)

#### 1.     *The Alleged Faxing of the Order Acknowledgments to Marjam*

In connection with this motion, Dayton has submitted six order acknowledgments that correspond with each of Marjam's six January 31, 2007 purchase orders. (*See* Decl. of Jennifer S. Roach, dated January 25, 2010 ("Roach Decl."), Ex. 2.)  Centeno testified that she generated these order acknowledgments for each of Marjam's January 31, 2007 purchase orders and faxed

---

[4]     Centeno testified that she crossed out the $0 unit price on the purchase orders and handwrote in the $13.78 unit price. (Centeno Dep. at 24-25.)

[5]     The transcript from the October 15, 2008 deposition of Vanessa Centeno ("Centeno Dep.") is attached to the Sharon Declaration as Exhibit A.

those acknowledgments to Marjam – specifically, to the location where Metcalf worked. (Centeno Dep. at 26, 36.)[6] Centeno could not, however, point to any records or fax confirmation sheets demonstrating that these acknowledgment forms were sent to Marjam.  (*Id.* at 26-28.)

Marjam denies that it ever received any order acknowledgments from Dayton with respect to its January 31, 2007 purchase orders.  (Def.'s 56.1 ¶¶ 2, 7, 10.)  In Metcalf's affidavit, he states that he personally never received any order acknowledgments from Dayton and that no one employed by Marjam ever brought any such order acknowledgments (or the price discrepancy contained therein) to his attention.  (Affidavit of James Metcalf, dated March 25, 2010 ("Metcalf Aff.") ¶ 23.)  Marjam contends that "Dayton has been unable to produce any [documentary] evidence that the order acknowledgments that Dayton purports to have generated in connection with the subject orders were faxed or otherwise sent to Marjam."  (Def.'s 56.1 ¶ 10.)

Centeno testified that at the time the purchase orders were submitted to Dayton in January 2007 and the order acknowledgments generated, Dayton's personnel were not required to keep proof of delivery (in the form of fax confirmations, for example) of the order acknowledgments. (Centeno Dep. at 27.)  The parties agree, however, that during discovery Dayton produced fax confirmation sheets for order acknowledgments sent to Marjam for separate orders placed in 2004.  (*See* Def.'s Counterstatement ¶ 23; Sharon Decl., Ex. F.)  Centeno, who testified that she had never seen these 2004 fax confirmation sheets prior to her deposition, did not know why fax confirmations of order acknowledgments were retained by Dayton in 2004, but not in 2007.  (*See*

---

[6]     Centeno testified that the purchase orders, on which she had manually crossed out the $0 unit price and penned the $13.78 unit price, were not faxed back to Marjam.  (Centeno Dep. at 28-29.)

Centeno Dep. at 27-28.)

### 2. *The Requirement That Order Acknowledgments Be Initialed Before Shipment of the Product*

The order acknowledgments that Dayton allegedly sent to Marjam in connection with the January 31, 2007 purchase orders contain the following prominently-displayed language: "This acknowledgment represents our understanding of the order. Please confirm all product and pricing information to avoid discrepancies. Please initial/date and fax back to the fax number listed in the header of the document." (Def.'s Counterstatement ¶ 24 (citing Roach Decl., Ex. 2).) There are lines for the customer's initials and the date just below this language on the order acknowledgment form.

Marjam contends that, despite this language, Dayton did not obtain initialed order acknowledgments from Marjam before it shipped the Levelayer – indeed, it could not have because, according to Marjam, the order acknowledgments were never sent to Marjam in the first instance. (*Id.* ¶ 25.) Centeno testified that at the time the January 31, 2007 purchase orders were received, and the corresponding order acknowledgments were generated and allegedly faxed to Marjam, Dayton did not insist that its customers (here, Marjam) return an initialed order acknowledgment prior to shipment. (Centeno Dep. at 20-21.) According to Centeno, Dayton's current policy is to insist that a customer return an initialed order acknowledgment before shipping any product when: (1) the customer has "consistent credit issues," or (2) "if there were consistent pricing discrepancies." (*Id.* at 20.) Centeno testified that: "if I were to receive [the January 31, 2007] purchase orders tomorrow, yes, [Marjam] would be required to sign" the order acknowledgment before any shipment would have been made. (*Id.* at 31.) When pressed as to

7

whether she considered the $0 unit price in the January 31, 2007 purchase orders to be a "major discrepancy in price back then on January 31, 2007," Centeno testified: "I probably did. I couldn't – I can't remember back to January 31, 2007 exactly what I would have thought." (*Id.*)

In Metcalf's affidavit, he states that as part of "[t]he order process utilized by Dayton, which was followed by Marjam," Dayton would fax an order acknowledgment to Marjam and then Marjam "would initial and return the order acknowledgment to Dayton by fax" before Dayton shipped the order out. (*See* Metcalf Aff. ¶ 21.) Dayton has moved to strike this paragraph of Metcalf's affidavit as lacking proper foundation. (*See* Mem. in Supp. of Mot. to Strike at 8.) In opposition, Marjam asserts that "Metcalf, as Product Manager, was expected to know (and does know), the process utilized in Marjam's ordering of product from Dayton." (Opp'n to Mot. to Strike at 12 n.15.)

It is well-settled that an affidavit submitted in opposition to a motion for summary judgment "must be made on personal knowledge, [and] set out facts that would be admissible in evidence . . . ." Fed. R. Civ. P. 56(e); *see also Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Rule 56(e)). Metcalf's affidavit does not set forth sufficient facts from which the Court may infer that he has or had personal knowledge as to each step of the ordering process used by Dayton when accepting orders from Marjam. In particular, Metcalf's affidavit does not demonstrate his personal knowledge of whether Marjam always sent an initialed order acknowledgment to Dayton before products were shipped. (*Accord* Metcalf Dep. at 4, 32 (testifying that although his duties as Product Manager including "handl[ing] . . . sales," he personally placed purchase orders only "from time to time" and that it was not one of his "daily

function[s]").)[7]  Accordingly, the Court will not consider or credit paragraph 21 of Metcalf's affidavit.

### Alleged Conversations Between Dayton and Marjam After Submission of the January 31, 2007 Purchase Orders

Marjam contends that after it submitted the January 31, 2007 purchase orders to Dayton, "neither Rizzo, nor anyone else from Dayton, called Metcalf to object to their content."  (Def.'s Counterstatement ¶ 18.)  Marjam asserts that Centeno did call Metcalf after receiving the purchase orders to discuss priority for shipping the orders.  (*Id.*)  According to Marjam, "Centeno did not raise any issue with respect to the price contained in the Purchase Orders during her call to Metcalf."  (*Id.*)  Dayton disputes these assertions and points to Centeno's testimony that she did not recall ever speaking to Metcalf about the January 31, 2007 purchase orders and that the shipment dates for those orders were determined not based upon any discussion with Metcalf about "priority," but simply upon product availability.  (Pl.'s Resp. to Def.'s Counterstatement ¶ 18.)

### Shipment and Invoicing of Levelayer

Dayton contends that after it received Marjam's January 31, 2007 purchase orders and sent corresponding order acknowledgments, Dayton shipped the Levelayer to Marjam, who accepted and took delivery of the Levelayer.  (Pl.'s 56.1 ¶¶ 10, 11.)  Dayton further asserts that it sent invoices to Marjam for the Levelayer at the $13.78 unit price.  (*Id.* ¶ 10.)  The record is unclear as to exactly when Dayton sent the invoices to Marjam.  The shipment dates indicated on each of the six invoices range from February 1 through 15, 2007.  (Roach Decl, Ex. 2.)  Metcalf

---

[7]  The transcript from the October 7, 2008 deposition of James Metcalf ("Metcalf Dep.") is attached to the Sharon Declaration as Exhibit E.

testified that the invoices were received by Marjam's accounts payable department as soon as 24 hours after each shipment. (Metcalf Dep. at 40.) Metcalf also testified that as these invoices were received by the accounts payable department, he was "immediately" notified by one or more accounts payable clerks of the discrepancy between the $0 unit price on the purchase order and the $13.78 unit price on the invoices. (*Id.* at 40-41, 44.)

Marjam contends that it promptly rejected the invoices because the prices and terms contained therein did not match Marjam's January 31, 2007 purchase orders. (Def.'s 56.1 ¶¶ 2, 7, 8, 10.) Specifically, Marjam asserts that it "informed Dayton that the invoices were incorrect within forty-eight hours of receipt." (*Id.* ¶ 11.) In his affidavit, Metcalf asserts that he spoke with Centeno as well as Joseph Rizzo, a regional sales manager employed by Dayton. (Metcalf Aff. ¶ 25.)

Dayton contends that Marjam "did not inform [Dayton] that the purchase order was intentionally submitted for $0 per unit . . . until [Dayton] contacted Marjam concerning payment of the invoices after they were past due." (Pl.'s 56.1 ¶ 11.) During his deposition, Rizzo testified that he did have a conversation with Metcalf about Marjam's refusal to pay the amount listed in the invoices but stated that this conversation occurred only after the invoices became "due and payable." (Rizzo Dep. at 23-24.) There is no clarification in the record, however, as to when, exactly, the invoices were considered "due and payable." Neither Metcalf nor Centeno testified as to conversations occurring between them after Marjam received the invoices. When discussing his conversations with Centeno at the time he submitted Marjam's January 31, 2007 purchase orders, Metcalf testified "Vanessa [Centeno] was a customer service representative, so there was no discussion of price at all with Vanessa, it was all about when we would be getting

the material." (Metcalf Dep. at 27-28.)[8]

### *Subsequent Communication Between Dayton and Marjam*

Marjam asserts that over the next several months, Metcalf engaged in "further communications" with Dayton "in an effort to resolve the matter amicably." (Def.'s Counterstatement ¶ 28.)[9] In particular, Metcalf testified as to a July 2007 telephone conversation that he had with Donald Van Gerve ("Van Gerve"), Dayton's Area Sales Director for the Northeast. According to Metcalf, Van Gerve called to discuss the parties' dispute and ultimately asked Metcalf "if I had intention of paying . . . for the material." (Metcalf Dep. at 61-62.) After Metcalf responded in the negative, Van Gerve asked him "if I had any material left." (*Id.* at 62.) Metcalf testified that he had not done an accounting of the inventory but "I probably did and I asked him why and he said he wanted to know if I was willing to return it." (*Id.*) Metcalf responded, in a statement laced with profanity, that Van Gerve should come get the material out of the warehouse if he wanted to. (*Id.*) Metcalf testified that Van Gerve hung up the phone and the two did not speak further after that. (*Id.*) According to Metcalf, he had not done an accounting at the time he made these statements, but estimated that he still had "probably about

---

[8] Dayton contends that Metcalf's statement in paragraph 25 of his affidavit – that he spoke with Centeno regarding Marjam's dispute over the invoices – contradicts this earlier deposition testimony. (*See* Reply Mem. at 5-6.) The Court disagrees. Metcalf testified that he never discussed pricing with Centeno prior to or at the time that he submitted the purchase orders. Metcalf did not give any testimony as to whether and in what regard he discussed his dispute about the invoices with Centeno. Accordingly, the Court will not disregard paragraph 25 of Metcalf's affidavit.

[9] Metcalf states in this affidavit that: "Rizzo advised me, among other things, that he had spoken with someone in Dayton's credit department, who acknowledged to him that Dayton had accepted the purchase orders." (Metcalf Aff. ¶ 27.) Dayton asserts, and the Court agrees, that this statement constitutes inadmissible hearsay. Therefore, the Court will not credit this statement. *See* Fed. R. Civ. P. 56(e)(1).

50 percent or less" of the Levelayer in his warehouses. (*Id.* at 63.) By the time of his deposition, Metcalf testified that the Levelayer in question was "[l]ong, long gone." (*Id.* at 64.) In recounting his communications with Metcalf, Van Gerve did not testify as to these specific statements that Metcalf alleges to have made. (*See* Van Gerve Dep. at 21-23, 109.)[10]

### *History of Levelayer Sales from Dayton to Marjam*

Marjam placed purchase orders for Levelayer with Dayton as early as 2003. The invoiced price for Levelayer during the period between 2003 and 2006 ranged from $12.15 per bag to $14.50 per bag. (Pl.'s 56.1 ¶ 14.) In 2005, Marjam placed orders for more than $125,000 of Levelayer at invoiced amounts of $12.15 to $12.75 per bag. (*Id.* ¶ 15.) In 2006, Marjam submitted approximately 25 separate purchase orders for a total of more than 19,000 bags of Levelayer. The total dollar volume of Levelayer ordered by Marjam in 2006 exceeded $262,000. Dayton sent 25 invoices to Marjam in 2006, with the price for Levelayer ranging from $12.75 to $13.78 per bag. (*Id.* ¶ 16.) Marjam, while not specifically admitting or denying these factual allegations, "avers, that in all events, it was overcharged for the [Levelayer] based on Dayton's price discrimination in violation of the [Robinson-Patman Act]," and that Marjam "complained to Dayton about its unfair pricing throughout this period, but that its complaints were ignored." (Def.'s Resp. to Pl.'s 56.1 ¶ 16.)

The parties agree that, prior to January 31, 2007, for each order placed by Marjam, Dayton sent an order acknowledgment, shipped the product and invoiced Marjam.[11] At no point

---

[10]     The transcript from the October 15, 2008 deposition of Donald Van Gerve ("Van Gerve Dep.") is attached to the Sharon Declaration as Exhibit C.

[11]     As noted above, with respect to its six purchase orders placed on January 31, 2007, Marjam specifically denies ever receiving an order acknowledgment.

prior to January 31, 2007 did Marjam ever submit a purchase order for Levelayer specifying a

unit price of $0, nor did Dayton ever ship Levelayer to Marjam without invoicing it at a per unit

price of at least $12.15.  (Pl.'s 56.1 ¶ 17.)

**_Terms Included in the Invoice_**

Dayton asserts that each invoice sent to Marjam contains a "Terms and Conditions"

section,[12] which contains the following two provisions: (1) Paragraph 1 states that finance

charges accrue on amounts not paid in full by the due date on the invoice at a rate of 1.5 per cent

per month; and (2) Paragraph 14 requires Marjam to pay attorneys' fees and costs of any suit

filed by Dayton in order to collect payment of invoices not paid in full.  (Pl.'s 56.1 ¶¶ 18, 19.)

Marjam asserts that the invoices connected to the Levelayer ordered on January 31, 2007 were

sent after the Levelayer was delivered and, as such, denies that the terms and conditions of those

invoices are applicable for those orders.  (*See* Def.'s Resp. to Pl.'s 56.1 ¶¶ 18, 19.)

## DISCUSSION

**I.      Legal Standard**

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate

where admissible evidence in the form of affidavits, deposition transcripts, or other

documentation demonstrates the absence of a genuine issue of material fact, and one party's

entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d

712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are

---

[12]      The invoices referenced by Dayton's 56.1 Statement had font so small as to render
them indecipherable.  (*See* Affidavit of Paul Fisher, dated January 21, 2010 ("Fisher Aff."), Ex.
2.)  The Court, however, referred to Invoice 163625 attached to the Complaint, which appeared
identical to Invoice 163625 attached to the Fisher Affidavit.

material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court, in considering a summary judgment motion, must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary

judgment motions. *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.' " *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.    *Material Issues of Fact Exist Regarding Whether a Valid and Enforceable Contract Existed*

"To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent and intent to be bound." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 507 (2d Cir. 2009). The parties agree that the present dispute over whether a valid contract has been formed is governed by Article 2 of the Uniform Commercial Code ("UCC"), which has been adopted by New York. *See Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 779 n.1 (2d Cir. 2003) (noting New York's adoption of the UCC effective September 27, 1964). Under Section 2-204 of the UCC, "[a] contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." N.Y. U.C.C. § 2-204(1); *see also Intersynco Suisse, S.A. v. Amtraco Supply Co., Inc.*, 590 F.2d 55, 56 (2d Cir. 1979). "In a contract for a sale of goods, the essential terms are quantity, price, and time and manner of delivery." *Fakhoury Enters., Inc. v. J.T. Distribs.*, 1997 WL 291961, at *3 (S.D.N.Y. June 2, 1997) (quoting *Judal Indus. v. Welsbach Elec. Corp.*, 138 A.D.2d 573, 573 (1988)) (internal quotation marks omitted). "[W]hen a dispute as to a

material term manifests a lack of intention to form a contract, no enforceable contract results."

*Id.* (quoting *Kleinschmidt Div. of SCM Corp. v. Futuronics Corp.*, 41 N.Y.2d 972, 973 (1977)).

The record before the Court is replete with genuine disputes of material fact preventing the entry of summary judgment or a finding in favor of Dayton on the issue of whether the parties engaged in conduct "sufficient to show agreement" that Dayton would sell the Levelayer to Marjam at the unit price of $13.78. First, the parties dispute whether Metcalf spoke with Rizzo before he placed the January 31, 2007 purchase orders, putting Rizzo on notice of his intention to order the Levelayer at a $0 unit price. Second, the parties dispute whether Centeno faxed to Metcalf (or anyone else at Marjam) an order acknowledgment reflecting Dayton's change of the unit price from $0 to $13.78. Third, the parties dispute whether Centeno called Metcalf – after the January 31, 2007 purchase orders were placed but before the Levelayer was delivered – and discussed shipment priority but neglected to mention the apparent disparity between the $0 unit price contained in the January 31, 2007 purchase orders and the $13.78 unit price contained on the order acknowledgment. Fourth, despite clear wording to the contrary on the order acknowledgment, Centeno testified that Dayton did not, in fact, require a customer to return an initialed order acknowledgment before an order would be shipped. Fifth, the parties dispute when Metcalf informed Dayton that Marjam did not intend to pay for the Levelayer at the $13.78 unit price. Finally, the Court finds it a question for a jury to decide whether Metcalf's statement to Van Gerve in July 2007, as recounted by Metcalf in his deposition testimony (*see* Metcalf Dep. at 61-62), actually constituted an "offer[ to] Dayton to reclaim the subject goods then remaining in Marjam's inventory (*see* Def.'s Resp. to Pl.'s 56.1 ¶ 7).

For the same reasons, these factual disputes prevent the Court from concluding, as

Marjam puts it, that "[t]o the extent a contract was formed, the purchase price is $0.00, not $13.78 per unit."  (Def.'s Opp'n at 12.)  Marjam asserts that: "(i) Marjam alerted Dayton of its intention to submit Purchase Orders at a special price, (ii) Marjam then submitted $0.00 Purchase Orders for a large volume of goods, (iii) Dayton then communicated directly with Marjam to arrange for delivery of those goods, and (iv) Dayton then delivered those goods before indicating to Marjam that Dayton required a different price."  (*Id.* at 12-13.)  According to Marjam, therefore, the parties entered into an agreement that the unit price would be $0 and "Dayton's invoice price would be deemed a material alteration of the contract that does not become part of the contract."  (*Id.* at 13 (citing N.Y. U.C.C. § 2-207(2))[13].)  Marjam argues that because the contracted-for unit price was $0, the Court may find that Marjam did not breach the contract as a matter of law.  (*Id.*)

The flaw in this argument, of course, is that three of the four factual allegations underpinning Marjam's position are vigorously disputed by the parties.  As noted above, the parties dispute: (i) whether Metcalf informed Rizzo of his intention to place a bulk order at a $0 unit price prior to his submission of the January 31, 2007 purchase orders, (ii) whether Centeno telephoned Metcalf after the purchase orders were submitted but failed to raise any issue regarding pricing, and (iii) whether Dayton sent Marjam order acknowledgments (prior to shipment) indicating that it would be charging Marjam at a $13.78 unit price rate.  Accordingly, the Court is not in a position to conclude, as a matter of law, that the parties entered into an agreement that Dayton would sell the Levelayer at issue to Marjam for a $0 unit price.

---

[13]     Section 2-207(2) provides that when an acceptance contains "additional terms" that are not present in an offer, "[b]etween merchants such terms become part of the contract unless: . . . [the terms] materially alter [the contract]."  N.Y. U.C.C. § 2-207(2)(b).

Finally, Marjam asserts that "summary judgment cannot be awarded to Dayton on its claim for interest and [attorneys'] fees" because the provisions for these remedies, as set forth in the "Terms and Conditions" section of the invoices, constituted "[a]dditional terms presented in an offeree's form [that] are not incorporated into a contract if the offeror timely rejects those additional terms." (Opp'n at 14 (citing N.Y. U.C.C. § 2-207(2)(c).) According to Marjam, Metcalf "rejected Dayton's non-conforming Invoices for the subject Purchase Orders in their entirety." (*Id.* at 15.) As noted above, however, there are disputed issues of fact regarding when and under what circumstances Marjam communicated to Dayton that it did not intend to pay the $13.78 unit price stated on the invoices. Thus, the Court cannot find, as a matter of law, that Marjam "timely reject[ed]" the invoices or the "Terms and Conditions" set forth therein.

## III.    *Dayton's Unjust Enrichment Claim*

Dayton asserts that "should the Court find that no contract existed, Marjam still must compensate Dayton Superior, as it has been unjustly enriched by accepting Levelayer and reselling it without paying Dayton Superior anything." (Reply Mem. at 5.)

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (quoting *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000)) (internal quotation marks omitted). The Second Circuit has noted, however, another important element of "the nature of an unjust enrichment claim in New York: 'The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates *in the absence of any agreement.*'" *Id.* at 586-87 (quoting *Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572

18

(2005)) (emphasis in the original).  As made clear by the New York Court of Appeals:

> The existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.  A "quasi contract" only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment . . . Briefly stated, a quasi-contractual obligation is one imposed by law *where there has been no agreement or expression of assent, by word or act, on the part of either party involved* . . . .

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388-89 (1987) (internal citations and quotation marks omitted, emphasis in the original).

Thus, when a "valid and enforceable" written contract governs the subject matter in dispute, a plaintiff may not recover under a theory of unjust enrichment.  *See Beth Israel Med. Ctr.*, 448 F.3d at 587 (dismissing unjust enrichment claim because valid written agreement existed between parties).  As noted above, the Court cannot determine on the present factual record whether there exists, as a matter of law, a valid and enforceable written agreement between Dayton and Marjam.  Accordingly, the Court cannot adjudicate Dayton's unjust enrichment claim at this juncture.  *See, e.g., Bekhor v. Josephthal Grp., Inc.*, 2000 WL 1521198, at *7 (S.D.N.Y. Oct. 13, 2000) (denying summary judgment on unjust enrichment claim when court was "unable to determine whether a written agreement governs" the dispute at issue, "and therefore is unable to determine whether plaintiffs are limited to a claim for breach of contract"); *accord Fox Cable Networks, Inc. v. Goen Techs. Corp.*, 2008 WL 2165179, at *4 (D.N.J. May 20, 2008) ("Because the Court cannot determine on summary judgment whether a contract exists, it cannot determine on summary judgment whether Plaintiffs may recover in quasi-contract.").

Alternatively, Dayton argues that it is entitled to compensation from Marjam pursuant to

Section 2-305(4) of the UCC (Reply Mem. at 5), which provides:

> (1) The parties if they so intend can conclude a contract for sale even though the price is not settled. . . . (4) Where, however, the parties intend not to be bound unless the price is fixed or agreed and it is not fixed or agreed there is no contract. In such a case, the buyer must return any goods already received or if unable so to do must pay their reasonable value at the time of delivery . . . .

N.Y. U.C.C. § 2-305. As noted above, however, there are numerous factual disputes as to whether the parties "fixed or agreed" to any particular price (whether it be $0 or $13.78 per unit) and these questions must be resolved by a trier of fact. Accordingly, the provisions of Section 2-305 do not come into play at this time.

## IV. Dayton's Motion to Strike Portions of Marjam's Opposition Papers

After Dayton filed its fully-briefed motion for summary judgment, Dayton filed a motion to strike certain portions of Marjam's opposition papers on the grounds that: (1) they "solely concern Marjam's counterclaims under the Robinson-Patman Act," and are irrelevant to Dayton's breach of contract claims; (2) certain documents were not produced prior to the filing of the motion (since discovery on Marjam's Robinson-Patman Act counterclaims was stayed pending the outcome of Dayton's motion to dismiss); and (3) certain affidavit statements "are replete with inadmissible hearsay and contain statements lacking foundation or not made on personal knowledge." (Mem. in Supp. of Mot. to Strike at 1.)

The Court has found that disputed record facts preclude the entry of summary judgment even without considering the portions of Marjam's opposition papers that Dayton now argues should be stricken. Accordingly, except to the limited extent noted, *supra*, the Court deems Dayton's motion to strike moot.

*CONCLUSION*

For the reasons set forth above, Dayton's motion for summary judgment is DENIED and

its motion to strike is deemed moot except to the limited extent noted, *supra*.

**SO ORDERED.**

Dated: Central Islip, New York
    February 22, 2011

_____/s/_____
Denis R. Hurley
Unites States District Judge